AMFAC RESORTS, L.L.C., Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, et al., Defendants.

National Park Hospitality Assn., Plaintiff,

v.

United States Department Of The Interior, et al., Defendants.

Hamilton Stores, Inc., Plaintiff,

v.

United States Department Of The Interior, et al., Defendants.

Aramark Sports And Entertainment Services, Inc., Plaintiff,

v.

United States Department Of The Interior, et al., Defendants.

CIV.A. 00–2838, 00–2885, 00–2937, 00–3085.

United States District Court, District of Columbia.

May 23, 2001.

Robert Richard Gasaway, Kirkland & Ellis, Washington, DC, Alan Stuart Feld, Bulman, Dunie, Burke & Feld,Chartered, Bethesda, MD, for plaintiff.

Marina Utgoff Braswell, U.S. Attorney's Office, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Now before the Court is a group of cases that implicate a variety of issues, all of which are covered in the defendants' motion to dismiss, and the parties' cross motions for partial summary judgment. At its heart, the dispute centers on the National Park Service's ("NPS") treatment of current and potential concessioners at various national parks. The plaintiffs—three of which are concessioners and one of which is an association of concessioners—

all allege that various NPS regulations are contrary to Congressional pronouncements on national park concession management.

On April 24, 2001, the Court ruled that the plaintiffs were not entitled to discovery beyond the administrative record, and that certain confidential information could be shared with experts, provided various conditions were observed. The Court also ruled that day that Delaware North, Inc., a concessioner, was entitled to intervene in this matter on behalf of the defendants. Delaware North is a competitor of the plaintiffs, and seeks to become a concessioner in certain parks where the plaintiffs currently hold concession contracts.

To summarize the Court's holding, the Court first holds that the plaintiffs' Rule 56(f) motion to stay summary judgment proceedings and take discovery must be DENIED.[1] The Court next holds that the defendants' motion to dismiss must be DENIED with respect to the preferential right to renewal issue, but GRANTED with respect two other issues.[2] Finally, the Court holds that the disputed regulations are permissible in all respects save one. The defendants' regulations are generally concise, well explained, and responsive to the many comments received from interested parties. The defendants only run afoul of the law in their requirement that concessioners bid on prospectuses or else lose their preferential right of renew-

---

1. This issue was substantially addressed in the Court's April 24, 2001 Opinion. In that Opinion, the Court determined that the plaintiffs were not entitled to extra-record discovery. *See* Memorandum and Order, Apr. 24, 2001, at 11–13.

Federal Rule of Civil Procedure 56(f) "allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the

plaintiffs are not entitled to any discovery, a stay of proceedings would not increase the plaintiffs' "opportunity to make full discovery." Thus, the plaintiffs' Rule 56(f) motion must be denied.

2. These two issues are the plaintiffs' claims regarding the timing of compensation for a concessioner's leasehold surrender interest, *see* Part.II.N, and Hamilton Stores' claim regarding the minimum franchise fee for the Yellowstone Park concession contract. *See* Part I.B.3.b.

al. An order consistent with this Opinion shall issue separately this date.

■ As a preliminary matter, the Court notes its jurisdiction under 28 U.S.C § 1331. The plaintiffs' well-pleaded complaints present an issue of federal law, and all parties concede as much. *See* Brief for Plaintiffs, Feb. 28, 2001, at 14–15; Brief for Defendants, Apr. 9, 2001, at 21. The law applicable to the resolution of this case is federal law, whether in constitutional, statutory, or common law form. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726–27, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (quoting *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 87 L.Ed. 838 (1943)) ("[A]gencies derive their authority to effectuate ... transactions from specific Acts of Congress passed in the exercise of 'constitutional function or power', [and thus] their rights, as well, should derive from a federal source.").

## I. THE DEFENDANTS' MOTION TO DISMISS

### A. Background

The plaintiffs have been concessioners in various national parks for the past 30 years.[3] Their concession contracts are set to expire on December 31, 2001, and they are currently interested in continuing as concessioners. To achieve this goal, the plaintiffs must participate in a contracting process dictated by the NPS. In the spring

of 2000, the NPS modified this process in light of recent legislation.[4]

■ The new contracting process is chiefly controlled by an NPS regulation entitled "Concession Contracts." 65 Fed. Reg. 20630 (Apr. 17, 2000); *see also* 36 C.F.R. 51. This regulation, states the NPS, has "three major purposes": (1) to enhance the competitiveness of contract bidding by diminishing various concessioners' "preference in renewal", (2) to convert the valuation of concessioners' capital improvements from a "possessory interest" valuation to a "leasehold surrender interest" valuation, and (3) to explain various smaller provisions that "concession contracts will contain in the implementation of the 1998 Act." 65 Fed Reg. 20630–31 (Apr. 17, 2000); 36 C.F.R. 51. This regulation is supplemented by a second regulation, entitled "Standard Concession Contract", which incorporates the changed terms into a new contract. *See* 65 Fed.Reg. 26052. It is these two regulations, as well as any "prospectuses"[5] issued pursuant thereto, that the plaintiffs challenge in multiple respects.

The defendants move to dismiss two of the plaintiffs' many claims. Specifically, the defendants claim that the law of standing and ripeness prevent the plaintiffs from pursuing (1) their joint claim for a preferential right of renewal, and (2) Hamilton Stores' claim of unreasonable franchise

---

**3.** The Court notes that one of the plaintiffs, the National Park Hospitality Association ("NPHA"), is not actually a concessioner. Rather, it is an association of concessioners. Nonetheless, as the NPHA comes before the Court on behalf of its members, and for ease of reference, the Court refers to the NPHA as a "concessioner."

**4.** On November 13, 1998, Congress significantly altered concession management policies by enacting the National Parks Omnibus

Management Act of 1998. 16 U.S.C. §§ 5951–5966. As the motion to dismiss concerns only standing and ripeness issues, it is not necessary to discuss the details of the Act at this point.

**5.** In this context, a "prospectus" is in invitation to bid on a contract. It contains various information necessary to formulate a bid, including a copy of the specific contract up for bidding.

fee.[6] These two claims will now be shortly described.

### 1. The Plaintiffs' Joint Claim of a Contractual Right to Preferential Renewal

All four plaintiffs claim that their concession contracts give them a preferential right of renewal. This right would give each plaintiff the right to match the best bid made on a prospectus, and thereby obtain the concession contract. The defendants deny that this right even exists, but also argue that, even if it does, this claim must be dismissed because it "essentially concerns what might happen to [the plaintiffs] upon the expiration of [their] Contracts." Brief for Defendants, Jan. 19, 2001, at 1–2. That is, as the disputed concession contracts have yet to be awarded, the plaintiffs have yet to be denied any contract. It is quite possible, argue the defendants, that the plaintiffs may obtain the sought after concession contracts, and thus suffer no harm from the loss of their preferential right of renewal.

### 2. Hamilton Stores' Claim on the Yellowstone Park Prospectus' Franchise Fee Requirement

By statutory mandate, the NPS is to set a minimum franchise fee based "upon consideration of the probable value to the concessioner of the privileges granted by the particular contract involved." 16 U.S.C. §§ 5952(4), 5956(a). The probable value of a contract's privileges, in turn, "shall be based on a reasonable opportunity for net profit in relation to the capital invested and the obligations of the contract." 16 U.S.C. § 5956(a). Thus, by statute, the NPS is required to determine the capital investment that a new concessioner will likely make if awarded the contract.

Generally speaking, when a new concessioner obtains a concession contract, that concessioner is required to purchase the exiting concessioner's inventory, equipment, and real property interests. AR, 17–18. These purchases, among others, make up the new concessioner's "capital investment." The greater a concessioner's capital investment will be, the lower the NPS sets the minimum franchise fee in the prospectus. Thus, an undervaluing of an exiting concessioner's inventory, equipment and real property interests will result in an overestimate of the minimum franchise fee required of new concessioners. This overestimate, in turn, might be unlawful if it were to deny a concessioner a "reasonable opportunity for net profit." 16 U.S.C. § 5956(a).

Hamilton Stores alleges that its inventory, equipment, and real property interests have been significantly undervalued and that the resulting minimum franchise fee for the Yellowstone contract is too high.[7] This, Hamilton argues, "flatly violates the statutory rule requiring NPS to offer concession contracts that would provide the concessioner with 'a reasonable opportunity for net profit in relation to capital invested.'" Brief for Hamilton Stores, Feb. 28, 2001, at 1.

It is important to recognize that, although Hamilton is alleging a miscalculation of its *current* possessory interests, its

---

**6.** The defendants also move for dismissal on various jurisdictional grounds, but concede that the Court, at the least, has federal question jurisdiction. *See* Brief for Defendants, Apr. 9, 2001, at 21.

**7.** The NPS hired Dornbusch & Company to value Hamilton Stores' inventory, equipment, and real property interests. See AR, 1748–62 (memorandums by Dornbusch & Co. explaining the valuations of Hamilton Stores' assets, and the appropriate franchise fee in light thereof).

claim is from the perspective of a *future* concessioner. That is, the harm for which Hamilton is seeking redress is its *future* disbursement of excessive franchise fees, *not* the insufficient compensation paid to it as an exiting concessioner.[8]

\*　　\*　　\*　　\*　　\*　　\*

The Court now considers the defendants' arguments to determine whether the plaintiffs are properly before this Court.

## B. Analysis

### 1. Standard of Review

If a plaintiff has failed "to state a claim upon which relief can be granted," a court may grant a defendant's motion to dismiss. Fed.R.Civ.P. 12(b)(6); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C.Cir.2000). In evaluating a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and give the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *Wiggins v. Hitchens*, 853 F.Supp. 505, 508 n. 1 (D.D.C.1994) (citing 2A Moore's Federal Practice, § 12.07, at 63 (2d ed.1986)

(footnote omitted); *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987)).

### 2. The Law of Standing and Ripeness

■ The doctrines of standing and ripeness are "designed to test the fitness of controversies for judicial resolution." *Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1382 (D.C.Cir. 1996). They both contain a "blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464–471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *CC Distributors v. United States*, 883 F.2d 146, 149 (D.C.Cir.1989).

#### (a) Standing

■ To have constitutional standing, a plaintiff must show that (1) it has "suffered an injury in fact" that is (2) "fairly ... traceable to the challenged action of the defendant" and which (3) will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotations omitted); *see also Allen v. Wright*, 468 U.S. 737, 756, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

---

**8.** Hamilton Stores' compensation for its inventory, equipment, and real property interests is calculated under the terms of its concession contract, not under any statute or regulation. For example, section 12 of the Hamilton Stores' contract provides extensive directions on the determination of Hamilton's possessory interests. See Hamilton Stores Concession Contract, AR 212–13 (providing that the "fair value of a possessory interest shall be the sound value of the improvement to which it relates at the time of transfer of such possessory interest, without regard to the term of the contract. The sound value of any structure, fixture, or improvement shall be determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value").

Thus, if Hamilton were alleging underpayment of its possessory interests, its claim would lie in contract law, not the arbitrary and capricious standard of the APA and the Tucker Act.

A plaintiff's alleged injury qualifies as a constitutional "injury in fact" if the plaintiff suffers an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130; *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Sierra Club v. Morton*, 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Of importance in the case sub judice, this Circuit has repeatedly recognized as an injury the "loss of . . . opportunity to compete for a contract." *CC Distributors*, 883 F.2d at 150; *see also Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C.Cir.1999); *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829 (D.C.Cir. 1997).

In *CC Distributors v. United States*, this Circuit considered a government contractor's challenge to an Air Force policy which diminished the contractor's opportunity to secure contracts. The government argued that, since the contractor had not yet been denied a contract, it had not yet sustained a constitutional injury. *C.C. Distributors*, 883 F.2d at 149–50. The Court disagreed, and held that "a plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive the benefit had it been accorded the lost opportunity." *Id.* at 150. In support of this, the Court noted a broad variety of caselaw that supports the general proposition that the "denial of an opportunity" is a cognizable injury. *Id.* at 150 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *West Virginia Ass'n of Comm. Health Centers v. Heckler*, 734 F.2d 1570 (D.C.Cir.1984); *National Ass'n of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321 (D.C.Cir.1976)).

■ Apart from its constitutional dimensions, standing also has a prudential aspect. This aspect requires that a court determine whether the plaintiff's interests are "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Association of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In other words, a court should ask "whether, in view of Congress' evident intent to make agency action presumptively reviewable . . . Congress intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *see also CC Distributors*, 883 F.2d at 151.

### (b) Ripeness

■ Although the ripeness doctrine is often understood to overlap with the standing doctrine, *see Wyoming Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 48 (D.C.Cir.1999), it retains a separate analytical framework. The framework reveals the doctrine's dual pedigree—a pedigree that is partially traceable to Article III, but mostly traceable to the court's prudential goals of avoiding "abstract disagreements" and "premature adjudication." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *see also* 13A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice and Procedure, § 3532.1, at 118–19 (2d ed.1984) (recognizing the dual underpinnings of the single analytical framework).

■ In considering a claim's ripeness, a court is to evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1988); *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. 1507. A claim's fitness for judicial resolution hinges on "whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." George E. *Warren Corp. v. EPA,* 159 F.3d 616, 621 (1998). From a more pragmatic perspective, courts often defer judgment if intervening circumstances are likely to make "[judicial] resolution of the dispute ... unnecessary." *Edison Elec. Institute v. U.S. E.P.A.,* 996 F.2d 326, (D.C.Cir.1993); *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir.1986). With regard to the hardship caused by delayed review, courts generally consider hardship to be a "secondary concern" and only evaluate it if there are "doubts about the fitness [prong]." *Consolidated Rail Corp. v. United States,* 896 F.2d 574, 577 (D.C.Cir.1990); American Petroleum Inst. v. U.S.EPA, 906 F.2d 729, 739 n. 13 (1990). In cases where the fitness prong is satisfied, "lack of hardship cannot tip the balance against judicial review." *Id.; Askins v. District of Columbia,* 877 F.2d 94, 98 (D.C.Cir.1989); *Consolidation Coal Co. v. Federal Mine Safety & Health Review Comm'n,* 824 F.2d 1071, 1081–82 (D.C.Cir.1987).

### 3. The Defendants' Motion to Dismiss

■ Viewing these two claims against the law of standing and ripeness, the Court finds that preferential right claim may proceed, but that the franchise fee claim must be dismissed.

### (a) The Right to Preferential Renewal

■ At the outset, it is clear that the plaintiffs' claim of a contractual right to preferential renewal falls squarely within the rule that a loss of opportunity to compete is an injury in fact. The plaintiffs allege that they have a legal right, vested in them through contract, to renew their contract if they can match the next best bid. By preventing them from participating in the bidding process in this fashion, the defendants undeniably infringe upon interests which the plaintiffs claim are "legally protected." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. An injury in fact thus exists.

From a prudential standpoint, the Court finds little reason to depart from its finding of constitutional standing. As national park concessioners, the plaintiffs are almost per se within the "zone of interests to be protected" by the enactment of a statute titled the "National Parks Omnibus Management Act of 1998." *Association of Data Processing Serv. Orgs.,* 397 U.S. at 153, 90 S.Ct. 827. The plaintiffs are all central players in the concession system which Congress attempted to reform.

■ With regard to ripeness, the Court finds it appropriate to retain jurisdiction at this time. First, the preferential right of renewal issue is largely legal; it hinges on statutory and regulatory interpretation, and does not implicate a complicated array of facts. Second, the issue would not "benefit from a more concrete setting," as a fully executed contract would present the Court with substantially the same issues currently under dispute. *Warren Corp.,* 159 F.3d at 621. Moreover, the NPS's policy on this issue is clearly "crystallized" in its final form. *Eagle–Picher Indus. v. U.S. EPA,* 759 F.2d 905, 915 (D.C.Cir.1985). The NPS

has reviewed and re-reviewed the issue, and promulgated a lengthy regulation and explanation. Furthermore, the NPS has endorsed this view by issuing prospectuses which are consistent with the details enunciated in the regulations. *See* Brief for Plaintiffs, Feb. 28, 2001, at 19.

With regard to the plaintiffs' hardship should judicial review be delayed, the Court need not find any hardship because it has little doubt that the issues are currently fit for judicial review. *See Consolidated Rail Corp.*, 896 F.2d at 577.

### (b) Hamilton Stores' Franchise Fee Claim

■ The Court finds that Hamilton Stores does not have standing to bring its franchise fee claim, and also that the claim is not currently ripe for review.

First, it is entirely conjectural whether the minimum franchise fee of 3.5 percent will provide Hamilton Stores with a "reasonable opportunity for net profit." 16 U.S.C. § 5956(a). Not only is it pure conjecture whether Hamilton will obtain the new concession contract, but even if it did, it is even more conjectural whether the franchise fee, together with the future economic environment, will deny it the opportunity for a profit. Thus, Hamilton Stores does not have standing to bring this claim.

■ Likewise, Hamilton Stores' franchise fee claim is also not ripe. Whether a 3.5 percent franchise fee will permit Hamilton Stores (who may or may not be the new concessioner) a reasonable opportunity for net profit is *not* a "purely legal" issue; to the contrary, it is an issue highly contingent on facts which are currently unknown and unknowable. *Warren Corp.*, 159 F.3d at 621. Moreover, the reso-

lution of this issue would substantially benefit if it were posed in a "more concrete setting." *Id.* It is wholly beyond the judiciary's means to hypothesize on the economic health of national park concessions at some distant time. The Court is not blind to the fact that a 3.5 percent franchise fee may indeed be violative of section 5956(a). If Hamilton obtains the next Yellowstone concession contract, and thereafter determines there is not a reasonable opportunity for profit at a franchise fee of 3.5 percent, Hamilton may bring a claim at that time. Until then, this Court must decline to review the issue.

Hamilton Stores argues at great length that the minimum franchise fee is flawed because the capital asset valuation used to set the fee was itself flawed. Even if the Court were to accept this argument (which it emphatically declines to do), Hamilton has still failed to show that this flawed analysis causes it a current or imminent injury. The injury which Hamilton Stores alleges-the lost opportunity to earn a profit-is contingent upon several independent factors which may or may not occur. The occurrence (or non-occurrence) of any one of these factors could easily make the "resolution of the dispute ... unnecessary." *Edison Elec. Institute v. U.S.E.P.A.*, 996 F.2d at 326; *State Farm Mut. Auto. Ins. Co.*, 802 F.2d at 479. Hamilton Stores' franchise fee claim must thus be dismissed for lack of standing and ripeness.

### C. Conclusion

For the foregoing reasons, the Court finds that the plaintiffs may continue with their preferential renewal right claim. However, Hamilton Stores may not continue with its franchise fee claim.[9] The

---

9. In addition to the franchise fee claim, the Court dismisses one other claim pursuant to Rule 12(b)(1). *See* Part II.N. That issue did not become discrete until the parties briefed it during the summary judgment proceedings, and is most easily understood in that context.

Court therefore turns to the cross motions for summary judgment.

## II. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To survive a motion for summary judgment, the nonmovant must make a "sufficient showing to establish the existence of an element essential to that party's case." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. A "sufficient showing" exists when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### B. Applicable Law

 This case challenges the regulations and official policy of a federal agency. In considering such matters, Article III courts utilize the rule of deference promulgated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* requires a court to analyze agency action under a two-step analysis. "First, always, is the question of whether Congress has directly spoken to the issue. If the intent of Congress is clear, then that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 841, 104 S.Ct.

2778. If, however, the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [final action] is based on a permissible construction of the statute." *Id.* A construction is permissible if it is reasonable. The agency's construction, however, need not be the only or most reasonable interpretation, *see id.* at 843 n. 11, 104 S.Ct. 2778, it must merely be "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987). *See also General Elec. Co. v. United States Envt'l Protection Agency,* 53 F.3d 1324, 1327 (D.C.Cir.1995).

### C. The Contractual Right of Preferential Renewal

#### 1. Background

Almost 85 years ago, the National Park Service was created to oversee our national parks and to "conserve the scenery and the natural and historic objects and the wild life therein and ... provide for the enjoyment of the same." 16 U.S.C. § 1. Throughout this entire period, the NPS has relied on private concessioners for the provision of "lodging, food, merchandising, transportation, outfitting and guiding, and similar activities." 64 Fed.Reg. 20630 (Apr. 17, 2000).

During the 1960s, Congress and the NPS determined that certain incentives were necessary to maintain the continuity of operation in the national parks. With this in mind, Congress enacted the Concessions Policy Act of 1965. Section 20d of that Act stated:

The Secretary shall encourage the continuity of operation and facilities and services by giving preference in the renewal of contracts or permits and in the negotiations of new contracts of permits

to the concessioners who have performed their obligations under prior contracts or permits to the satisfaction of the Secretary.

16 U.S.C. § 20d.

After this statute was enacted, the plaintiffs in the instant case all entered into long-term concession contracts with the NPS. None of the contracts contained any provision granting the plaintiffs a preference in the renewal of their contracts.

In 1989, the Department of the Interior began a review of National Park concessions, with the goal of finding ways to enhance concession management. Three years later, in 1992, the Department issued a report making various findings and recommendations for improvement. Among the findings was the observation that the right of preference in renewal enjoyed by incumbent concessioners significantly impeded the competition for concession contracts. *See* 57 Fed.Reg. 40508, 40508 (Sept. 3, 1992).

In 1998, after the NPS tried to address this issue with regulations, Congress enacted the National Parks Omnibus Management Act of 1998 (the "1998 Act"). 16 U.S.C. §§ 5951–5966. Section 5952 of the Act orders that the

> Secretary shall not grant a concessioner a preferential right to renew a concessions contract, or any other form of a preference to a concessions contract.[10]

16 U.S.C. § 5952(7)(A). Although the 1998 Act expressly repealed the 1965 Act, Section 415 of the 1998 Act stated that:

> the repeal of [the 1965 Act] shall not affect the validity of any concessions contract or permit entered into under [the 1965 Act] but the provisions of this

[Act] shall apply to any such contract or permit except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit.

Pub.L. No. 105–391, Title IV, § 415(a), Nov. 13, 1998.

After the passage of the 1998 Act, the NPS reformed certain concession contract regulations to make them, in its opinion, consistent with the new statute. On the issue of whether contracts entered into under the 1965 Act contain a right to a preference in renewal, the NPS stated:

> In circumstances where a 1965 Act concession contract does not make express reference to a preference in renewal, it is the final administrative decision of the NPS ... that their repeal of the 1965 Act's preference in renewal by the 1998 Act is applicable to holders of 1965 Act concession contracts.

65 Fed.Reg. 20630, 20664 (Apr. 17, 2000); *see also* 36 C.F.R. § 51.102 (codifying the presumption against a preferential renewal right in a 1965 Act contract, unless express language indicates otherwise).

It is this agency policy which the plaintiffs urge the Court to hold contrary to law. The Court now undertakes that evaluation.

### 2. Analysis

The lawfulness of the defendants' regulations turns on whether the plaintiffs each have a contractual right to preferential renewal. If the plaintiffs do have such a right, then the NPS's regulations are unlawful because they unilaterally delete a valid contract term. If the plaintiffs do not have such a right, then the NPS's

---

**10.** Part (7)(B) of Section 5952 does permit the Secretary to grant this right to a small category of concessioners, specifically "outfitter and guide services and small [concession] con-

tracts." The issues surrounding the rights created by this provision are not addressed here, but rather in section E, *infra*.

regulations are lawful in that they have not diminished any of the plaintiffs' contractual rights and are an otherwise reasonable interpretation of the 1998 Act. In making this determination, the Court's review is necessarily limited to the administrative record. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The Court begins by noting the obvious, which is that no contract between the NPS and the plaintiffs contains an *express* term granting the concessioners a preferential right to renewal. Thus, the plaintiffs can only be found to have this right if one of three circumstances exists: (1) the right derives from statute, (2) the right derives from an implied contract, or (3) the right derives from an implied term in the current concession contracts. The Court finds that none of these situations exist, and therefore that the plaintiffs do not have a right to preferential renewal.

### (a) Contract Rights Established by Statute

■ "The principal function of a legislature is not to make contracts, but to make laws." *National R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry.,* 470 U.S. 451, 466, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). Thus, there exists a strong "presumption ... that a law is not intended to create private contractual or vested rights." *Id.* Of course, a legislature might, if it wishes, bestow upon a party a contractual right. But, given the presumption to the contrary, a legislature, must do so in "unmistakable terms." *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)).

■ The Court need not review the law on this issue further to conclude that the 1965 Act did not vest in the plaintiffs a contractual right to preferential renewal. Section 20d of the 1965 Act stated:

> The Secretary shall encourage the continuity of operation and facilities and services by giving preference in the renewal of contracts or permits and in the negotiations of new contracts of permits to the concessioners who have performed their obligations under prior contracts or permits to the satisfaction of the Secretary.

16 U.S.C. § 20d. This provision is egregiously short of conveying in "unmistakable terms" a contractual right to the plaintiffs. First, the provision is wholly bereft of even the most standard contractual language. For instance, there is no clause which notes that the renewal preference is "in consideration of" any act of the concessioners.

Second, the terms of the Act actually belie a contractual interpretation. By its terms, the Act orders the Secretary of Interior to "giv[e]" renewal preferences to the concessioners; it does not order the Secretary to *contract* with the concessioners for the renewal right. This observation is important, as elsewhere in the Act, the Secretary is explicitly authorized to *contract* for a preferential right of renewal in certain limited circumstances. *See* 16 U.S.C. § 20c. This suggests that, had Congress wished to create contractual renewal rights in concessioners like the plaintiffs, it would have provided such discretion to the Secretary. *See National Rifle Ass'n v. Reno,* 216 F.3d 122, 130–31 (D.C.Cir.2000) (where Congress includes particular language in one section of a statute, but omits it in another, the omission is presumed to be intentional). Congress's failure to do this forecloses any

possibility that the 1965 Act bestowed contractual renewal rights on the plaintiffs.

### (b) Implied Contracts

■ An implied-in-fact contract exists when parties "manifest their agreement . . . by conduct" instead of words. John D. Calamari & Joseph M. Perillo, The Law of Contracts, § 1.11, at 21 (4th ed.1998). As the Supreme Court has explained, the "meeting of minds" in an implied-in-fact contract is inferred from the "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (citation omitted).

Common examples include contracts for goods formed by a raised hand at an auction, or contracts for services formed by calling a repairman to your house. *See* Restatement (Second) of Contracts § 4 cmt. b In each case, the *facts* of the situation make clear that the parties wish to be bound in contract, even without an explicit offer and acceptance.

■ To demonstrate an implied-in-fact contract, a party must show "(1) mutuality of intent to contract, (2) consideration, (3) unambiguous offer and acceptance, and (4) that the representative whose conduct is relied upon had actual authority to bind the government." *See City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir.1998); *Hoffmann v. U.S.*, 53 F.Supp.2d 483, 488 (D.D.C.1999).

■ Based on this explanation of law and the administrative records filed in these cases, the Court finds that the plaintiffs do not have a preferential right to renewal derived from an implied contract. The Court finds nothing in the administrative record suggesting that the NPS and the plaintiffs entered into a contract through mere conduct. Nor, for that matter, have the plaintiffs provided a single citation to the record on this issue. Although the plaintiffs repeatedly refer to numerous declarations of individuals who deem the contractual right to exist; none of these declarations are part of the administrative record, and there is no compelling reason for the Court to look beyond the record and consider them. *See Esch v. Yeutter*, 876 F.2d 976, 991–92 (D.C.Cir. 1989) (summarizing the instances where a court may look beyond the administrative record in evaluating agency action). The Court thus finds that no implied contract for preferential renewal exists.

### (c) Implied Terms in Contracts

■ In the field of contract law, courts generally assume that "every person is . . . capable of managing his own affairs." 11 Lord, Williston on Contracts, § 31.5, at 298 (4th ed.1999). Nonetheless, in a small number of circumstances, courts have been willing to add—or imply—terms into written and fully integrated contracts. As summarized by one federal court:

> Implied covenants are disfavored. Only two circumstances are held to warrant implication of a covenant: (1) the parties thought it so obvious it did not need stating or (2) it is a necessary result of what is stated, either as an implication of the language used or it is indispensable to effectuate the intention of the parties.

*In re KDT Industries, Inc.*, 30 B.R. 252, 254 (S.D.N.Y.1983); *see also* 11 Lord, Williston on Contracts, § 31.7, at 317–23 (4th ed.1999) (summarizing caselaw on implied contract terms).

Often times, the terms sought to be implied are statutes in existence at the time the contract was formed. In considering this proposition, the U.S. Supreme Court concluded that a state law should be implied as a contract term only if the term

is "so central to the bargained-for exchange between the parties, or to the enforceability of the contract as a whole, that it must be deemed to be a term of the contract." *General Motors Corp. v. Romein,* 503 U.S. 181, 188–89, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (emphasis added); *see also Sacramento Navigation Co. v. Salz,* 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed. 663 (1927) ("A contract includes not only the promises set forth in express words, but in addition all such implied provisions as are indispensable to effectuate the intentions of the parties and arise from the language of the contract and the circumstances under which it was made.").

A short example illustrates the intuitive nature of this doctrine. The case involved a contract between the United States government and a refrigerator contractor. *See City of New York v. U.S.,* 125 Ct.Cl. 576, 113 F.Supp. 645 (1953). The government leased a certain quantity of "cooler" space at a rate of $1.00 per square foot, and another quantity of "freezer" space at a rate of $1.50 per square foot. After the parties agreed on a total price of $270,000, the government sought additional "freezer" space in place of its "cooler" space. However, the government refused to pay any extra price, arguing instead that the terms of the lease provided the government with the option of switching between cooler and freezer space, but did not provide for an adjustment in contract price. *Id.* at 646. The court disagreed, and found it patently obvious that a change in refrigerator space would necessitate a change in the total price. The court then supplied the contract with such a clause based on what was undoubtedly "intended at the time of the execution of the [contract]." *Id.* at 647.

■ In light of the foregoing law, the Court finds that a preferential right of renewal is not an implied term in the

plaintiffs' current concession contracts. First, it can hardly be said that the preferential right of renewal was "so obvious[ly] [a part of the contract that] it did not need stating." The preferential renewal term is a significant contract term, one that would clearly be a large component of the bargained-for exchange. It is not a routine term, and it is certainly not the type of term that sophisticated parties such as the NPS and the plaintiffs would consider "so obvious" as to leave unwritten. The administrative record provides no indication that the parties had the *mutual* understanding that the contract contained the renewal term.

Second, nothing in administrative record suggests that the renewal term is "indispensable to effectuate the intention of the parties." As just stated above, the administrative is wholly devoid of information suggesting that the NPS *intended* the renewal term to be part of the contract. Moreover, the contract is not rendered senseless or ineffectual without the renewal term. To the contrary, the contract has sufficed for the past 30 years, and is such that the plaintiffs seek to re-enter it once again. Thus, the Court finds that the preferential right of renewal is not an implied term in the plaintiffs' concession contracts.

\* \* \* \* \* \*

■ Thus, finding that the plaintiffs do not have a contractual right of renewal, the Court finds that the NPS's regulations and prospectuses are a reasonable interpretation of applicable law on this issue. The Court now turns to a related issue: whether the NPS's regulations are unlawful with respect to concessioners that have a *statutory* right of preferential renewal.

### D. The Statutory Right of Preferential Renewal

■ In the preceding section, the Court held that the plaintiffs do not have a

contractual right of preferential renewal. This does not end the renewal issue, however. The 1998 Act explicitly grants a preferential renewal right to concessioners with gross receipts of less than $500,000 annually, and to outfitting and guide concessioners. *See* 16 U.S.C. § 5952(7)(B). Although Amfac, Aramark, and Hamilton Stores dô not fall within these parameters, many members of the National Park Hospitality Association ("NPHA") do. Thus, because the NPHA has associational standing in this respect, the Court now considers whether the NPS regulations which implement concessioners' statutory right of preferential renewal are contrary to law. The NPHA makes six arguments as to the regulations' unlawfulness.

### 1. Matching the Terms of the Best Offer

 The NPHA complains that NPS regulations require incumbent concessioners wishing to exercise their preferential right of renewal to not just match the best proposal, but to submit a *better* proposal. More specifically, the NPHA argues that incumbent concessioners are given the opportunity to match the "better terms and conditions of the best proposal," but are not permitted to also adopt the weaker terms of the best proposal. 36 C .F.R. § 51.32. In this respect, the final proposal of the incumbent concessioner would contain better terms and conditions than any other proposal.

The defendants argue that this is not true, and that the incumbent concessioner is indeed "entitled to match the terms and conditions, both more favorable and less favorable than what the incumbent offered, of the best proposal." Brief for Defendants, Apr. 9, 2001, at 32. Thus, the defendants assert that "[t]here is simply no dispute here for the Court to resolve." *Id.* The Court agrees, and declines to opine in

the absence of a case or controversy. Nonetheless, the Court notes that the defendants' statement in their brief is "nothing less than an official interpretation of the [1998 Act] which the agency may not change unless it provides a reasoned explanation for doing so." *Washington Legal Foundation v. Henney,* 202 F.3d 331, 336 (D.C.Cir.2000).

### 2. Incumbent Concessioners' Duty to Bid

 The NPHA also contests the legitimacy of 36 C.F.R. § 51.35. This section states:

> If the Director receives no responsive proposals, including a responsive proposal from a preferred offeror, · in response to a prospectus for a qualified concession contract for which a preferred offeror exists, the Director must cancel the solicitation and may resolicit the concession contract or take other appropriate action in accordance with this part. No right of preference will apply to a concession contract resolicited under this section unless the contract is resolicited upon terms and conditions materially more favorable to offerors than those contained in the original contract.

36 C.F.R. § 51.35. NPHA argues that this regulation is an unlawful interpretation of section 403(4)(C) of the 1998 Act. That section reads:

> If all proposals submitted to the Secretary either fail to meet the minimum requirements or are rejected by the Secretary, the Secretary shall establish new minimum contract requirements and reinitiate the competitive selection process pursuant to this section.

16 U.S.C. § 5952(4)(C).

The gravamen of the disputed regulation lies in the incentives it creates for concessioners with statutory preferences in re-

newal. When a prospectus is issued and no bids are received (even one from the incumbent concessioner), the NPS, in an effort to obtain bidders, reissues the prospectus on terms that are more favorable to the concessioners. The problem with this, according to the NPS, is that a "no-bid" situation can occur for two different reasons. First, it might be that the pro-spectus was so poorly drawn that no entity is interested in being a concessioner under such terms. Or second, it might be that the terms are fair, but that no bidder wishes to spend the resources bidding with the expectation that the incumbent concessioner will likely obtain the contract in the end. If the second situation is the reason that no bids are received, then the NPS will end up re-drafting the prospectus with more favorable terms, even though the incumbent concessioner might be willing to accept the contract on the original terms. Thus, in many cases, an incumbent concessioner is able to attain better terms just by withholding its own bid.

The NPS regulation seeks to combat this disincentive for incumbent concession-ers to bid. When a prospectus is reissued for the first reason—that is, the terms are unappealing for *all* bidders—then an in-cumbent concessioner would retain its preferential right of renewal. An original prospectus is considered unappealing for all bidders when the new prospectus con-tains terms which are "materially more favorable" to concessioners. If, however, a prospectus is reissued for the second rea-son—an incumbent concessioner is willing to accept the contract but is holding out for more favorable terms—the incumbent concessioner forfeits its preferential right of renewal. Thus, under 36 C.F.R. § 51.35, an incumbent concessioner's clear

incentive is to bid on every prospectus it is willing to accept.

The question before the Court is there-fore whether Congress, in enacting the 1998 Act, "directly spoke[ ] to [this] issue," and if not, whether the "agency's [regula-tion] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 841, 104 S.Ct. 2778. The Court finds that Con-gress, by the text of the 1998 Act, has foreclosed the NPS's discretion on this issue. The statute clearly mandates what the NPS must do in a no-bid situation; it must "re-initiate the competitive selection process pursuant to [section 5952]." 16 U.S.C. § 5952(4)(C). Section 5952 pro-vides a statutory right of preferential re-newal to certain concessioners, and in no way makes this right contingent upon sub-mitting a bid. The NPS's sole argument on this issue stands on the wisdom of its regulation, and completely overlooks the fact that Congress, in its own wisdom the Court must assume, has already addressed the issue. The Court therefore sets aside section 51.35 and any provision of the NPS's regulations to the extent a prefer-ential right of renewal is made contingent upon factors not enumerated in 16 U.S.C. § 5952.

### 3. The Timing of the Determination of a Concessioner's Preferential Right of Renewal

■■■ The NPHA argues that the NPS is obligated to finally establish a conces-sioner's status as a preferred concessioner *before* the concessioner is obligated to bid on a prospectus. By delaying the final determination, argues the NPHA, the NPS is forcing concessioners to submit their own proposals when they would otherwise wait and simply match the best proposal.[11]

---

11. Although each prospectus identifies the preferred offeror for that concessions con-tract, a concessioner's preferred status, or lack thereof, is not final until an administra-tive appeal is exhausted. Because the NPS does not permit parties to pursue appeals

In this way, a concessioner enjoying a preferential right of renewal may nonetheless end up submitting a more aggressive proposal than a competitor.

The 1998 Act commands the NPS include in each prospectus "a description of a preferential right of renewal ... held by an existing concessioner." 16 U.S.C. § 5952(3)(H). In accordance with this, the NPS regulations require the NPS Director to determine whether a concessioner is a preferred offeror "no later than the date of issuance of a prospectus for the applicable new concession contract." 36 C.F.R. § 51.28. The Court fails to see any conflict between the NPS's regulation and the 1998 Act, and therefore declines to strike any regulatory provision on this issue.

### 4. The Intra–Agency Appeals Process

■■■ The plaintiffs allege a Fifth Amendment Due Process violation in the manner in which the NPS designates the person who adjudicates appeals. According to the NPHA, the NPS regulations provide that the Director of the NPS will not only make the initial determination on right of preference issues, but will also preside over the appeal of that decision. *See* Brief for Plaintiffs, Feb. 28, 2001, at 42.

In their brief, the defendants clarify that the initial determination whether an incumbent concessioner is entitled to a preferential right of renewal and the final determination on appeal will be handled by separate people. *See* Brief for Defendants, Apr. 9, 2001, at 35–36. Seeing that the dispute has been obviated by the defendants' clarification, the Court will not opine on the matter except to note that the defendants' position is "nothing less than an official interpretation of the [1998 Act] which the agency may not change unless it

provides a reasoned explanation for doing so." *Washington Legal Foundation,* 202 F.3d at 336.

### 5. The Requirement of a Stay Pending Intra–Agency Appeal

■■■ The NPHA argues that the defendants' rules on intra-agency appeal violate section 10(c) of the Administrative Procedure Act. That section provides for judicial review of final agency decisions, unless the agency provides "for an appeal to a superior agency authority," and meanwhile renders the disputed decision "inoperative." 5 U.S.C. § 704. The gist of the NPHA's argument is that a decision denying a concessioner a preferential right of renewal is not rendered "inoperative" unless the bidding process on that contract is stayed pending the resolution of the appeal. If the process is not stayed, then an erroneous decision by the initial decisionmaker will affect the bidding process, since "[b]ids by both incumbent and non-incumbent concessioners will, of course, vary based on whether the incumbent has a right to match the best proposal." *See* Brief for Plaintiffs, Feb. 28, 2001, at 44 n. 8.

The Court disagrees that the NPS is in violation of Section 10(c). The core impact of a decision on a concessioner's preferential right of renewal is whether that concessioner will be permitted to match the best proposal. Thus, to render an initial decision on this issue "inoperative," the agency must see to it that the preferential right may still be exercised if finally determined to exist. The defendants have done this. Although the initial preferential right decision may exert certain collateral affects while pending appeal, it is a far stretch to say that the decision is therefore

---

until the bidding is complete, a preferred concessioner that is not so-labeled in the prospec-

tus is forced to bid on a contract it would otherwise decline to bid on.

"operative." If that were the case, then a great majority (if not all) agency decisions would remain operative pending appeal, because every decision has collateral effects well beyond the issue underlying the decision. For example, an initial agency decision will often serve as an impetus for parties to retain counsel or alter their travel plans. It cannot be said, however, that the decision is therefore "operating" on the parties prior to the appellate decision. The Court therefore finds that, because the central issue of a preferential right determination is rendered inoperative, the defendants are not in violation of section 10(c) of the APA.

### 6. The Information Used in the Determination of a Preferential Right of Renewal

 The plaintiffs argue that the defendants plan to employ an "impermissibly vague" set of factors to determine whether a concessioner has performed satisfactorily during its contract, and is therefore entitled to a preference in renewal. *See* Brief for Plaintiffs, Feb. 28, 2001, at 44. Although the NPS usually makes this decision based on concessioners' annual evaluations, NPS regulations also permit the NPS to view "other relevant facts and circumstances." 36 C.F.R. § 51.44.

The defendants explain that this provision is not a license to investigate concessioners and hide the evidence from them until the time for renewal. Rather, it is a way of ensuring that, if it is determined after the fact that a concessioner's performance was actually less than satisfactory in a given year, the NPS can use that information in its consideration of whether, the concessioner's performance, on the whole, was indeed satisfactory.[12]

Therefore, with the understanding that the "other relevant facts and circumstances" that will be used by the defendants in addition to the annual evaluations are only facts and circumstances "previously withheld from the NPS," there appears to be no dispute for the Court to resolve. Of course, as explained previously herein, the defendants' explanation in their brief is "nothing less than an official interpretation of the [1998 Act] which the agency may not change unless it provides a reasoned explanation for doing so." *Washington Legal Foundation,* 202 F.3d at 336.

\* \* \* \* \* \*

With the NPHA's objections to the defendants' regulations on concessioners' statutory right of preferential renewal resolved, the Court now turns to the next of the plaintiffs' arguments.

### E. The Illusory Contract Issue

 The plaintiffs next argue that two provisions in the NPS's proposed concession contract render the contract impermissibly ambiguous and illusory. The disputed provisions permit the NPS to impose additional duties on the concessioners during the life of the contract, and to terminate the contract at any time. *See* Standard Concessions Contract, 65 Fed.Reg. 26052. The Court disagrees and finds the NPS's standard concession contract acceptable under *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### 1. The "Additional Duties" Provision

Section 5(a) of the NPS's standard concession contract requires the concessioner

---

12. The defendants explain that "there may be occasions when the NPS becomes aware of actions of a concessioner that may result in a determination of less than satisfactory performance that were not revealed in the annual evaluation." 65 Fed.Reg. at 20645.

to "comply with all Applicable Laws in fulfilling its obligations under [the] CONTRACT at the Concessioner's sole cost and expense." 65 Fed.Reg. 26065. Section 2(a) of the contract defines "applicable laws" as "the laws of Congress governing the [park], including, but not limited to, the rules, regulations, requirements and policies promulgated under those laws, ... whether now in force or amended, enacted or promulgated in the future." 65 Fed. Reg. 26063.

This is a standard provision for these types of contracts, and has been "standard in NPS concession contracts for many years," including the ones currently held by the plaintiffs. 65 Fed.Reg. 26053. The plaintiffs nonetheless argue the NPS's right to impose additional duties on the concessioners renders the contract (1) impermissibly ambiguous, (2) illusory, and (3) contrary to section 407(a) of the 1998 Act. The Court disagrees on all three counts.

■ First, the court accepts the general notion that ambiguous bid solicitations are generally disfavored. *See International al Ass'n of Firefighters v. United States Dep't of Navy*, 536 F.Supp. 1254, 1269 (D.R.I.1982). The Court, however, fails to find the solicitation ambiguous because the contested provisions are not capable of more than one interpretation. To the contrary, the provisions state quite clearly the conditions under which the concessioners' duties will change. The mere fact that the exact parameters of those duties are not known at the time of contracting does not somehow render the contract ambiguous. If that were the case, then all contracts would be ambiguous, since all parties to a contract must continually modify their performance to remain in accordance with changing laws.

■ Second, the Court fails to find any way in which these provisions make the contract illusory. An illusory contract is one in which one party "gives consideration that is so insignificant that an actual obligation cannot be imposed." *Woll v. United States*, 45 Fed. Cl. 475 (1999). The standard concession contract imposes a host of duties on the NPS, and the mere existence of the disputed provisions does not render the duties optional. Of course, in the unlikely event that the NPS were to pass so many regulations as to make all of its contractual duties optional, the plaintiffs might have a case. But that has not happened, and therefore, the contract as it currently stands is not illusory on account of these provisions.

■ Third, the Court finds that the contested provisions are not contrary to section 407(a) of the 1998 Act. This provision states:

A concession contract shall provide for payment to the government of a franchise fee or such other monetary compensation as determined by the secretary upon consideration of the probable value to the concessioner [which] shall be based on a reasonable opportunity for net profit in relation to capital invested and the obligations of the contract.

The plaintiffs argue that, since the exact scope of concessioners' future duties is not known, and the 1998 Act only permits the franchise fee to be modified for "extraordinary and unanticipated" reasons, there is no way to ensure that the plaintiffs will maintain a "reasonable opportunity for net profit." That is, as a change in future duties could increase costs without simultaneously lowering the franchise fee, the provision permitting the imposition of additional duties is at odds with the opportunity to maintain a reasonable profit margin. Although the addition of future duties may increase costs, the plaintiffs are mistaken that the mere possibility of this is enough to make the current concession

contract facially violative of the 1998 Act. There is no reason to believe that, these disputed provisions, by their very inclusion in the contract, *completely foreclose* the possibility that a concessioner could make a reasonable profit. It is quite possible, for example, that the NPS will factor the possibility of additional duties into the initial franchise fee. On the other hand, if such measures are not taken, and an additional duty imposed in the future does impair a concessioner's opportunity for reasonable profit, the concessioner's remedy is to bring a *Chevron*-based challenge against the new regulations. But for now, the plaintiffs' challenge must fail, as a claim based on the mere possibility of a future claim is not a claim at all.

### 2. The Unilateral Termination Provision

██ The standard concession contract issued by the NPS gives the NPS the right to "terminate [the] CONTRACT at any time in order to protect [park] visitors, protect, conserve and preserve [park] resources, or to limit visitor services in the [park] to those that continue to be necessary and appropriate." Standard Concession Contract, § 16(b)(1); 65 Fed.Reg. 26072. The plaintiffs argue that this gives the NPS the right to "cancel at [its] pleasure." Brief for Plaintiffs, Feb. 28, 2001, at 26.

The Court disagrees. The contract explicitly hinges the NPS's capacity to terminate on the necessity and appropriateness of the action. While the Court concedes that these terms do not have a precise meaning, it does not therefore follow that they have no meaning at all. Clearly, under the standard concession contract, the NPS cannot terminate the contract at its pleasure.

### F. The Applicability of the Contract Disputes Act

██ One of the NPS's regulations implementing the 1998 Act declares that

[c]oncession contracts are not contracts within the meaning of 41 U.S.C. § 601 et seq. (the Contract Disputes Act) and are not service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions.

65 Fed.Reg. 20632, 20634. The plaintiffs argue that this regulation is contrary to law because the Contract Disputes Act ("CDA") is applicable to concession contracts and the NPS has no authority to circumscribe the applicability of the CDA. The Court finds that the CDA does not apply to concession contracts, and therefore that the disputed regulation is permissible.

The proper place to begin is with the text of the CDA. By its text, the Act applies to

any express or implied contract ... entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or

(4) the disposal of personal property.

41 U.S.C. § 602(a). The Court is thus faced with the question whether a concession contract is one of these enumerated contracts. Preliminarily, it is fair to narrow the list down to contracts (2) and (3). There is little argument that concession contracts are contracts for the procurement or disposal of personal property. The plaintiffs do not argue to the contrary.

The Court first finds that the CDA is ambiguous with respect to whether con-

cession contracts are contracts listed in section 602(a)(2)-(3). On one hand, the government *is* receiving services; it is contracting for the provision of amenities to the visitors of its national parks. Moreover, because the concession contracts contain various terms relating to the stewardship of concession areas, *see* Standard Concession Contract, § 6(g), 9(a), 9(d), 10(a), 65 Fed Reg. at 26067–26068, it can be said that the government is also bargaining for the maintenance of real property. On the other hand, the basic nature of concession contracts differs markedly from that of typical procurement contracts; in concession contracts, the government is not attempting to *procure* chattel or services for itself, but is rather permitting another to use its land, as in a leasor/leasee relationship. In addition, when the government procures something, it usually assumes the role of payor, not payee as in this case.

Given this ambiguity, the Court is next charged with determining whether the NPS regulation is a reasonable interpretation of the section 602 of the CDA. *See Chevron*, 467 U.S. at 841, 104 S.Ct. 2778. The Court finds that it is. First and foremost in support of this conclusion is the Congressional statement that concession contracts are contracts "to authorize a person, corporation or other entity to provide accommodations, facilities and services to visitors to units of the national park system." 16 U.S.C. § 5952. Thus, Congress sees concession contracts as *authorization* contracts, not procurement contracts. This view is further supported by the fact that, when Congress defined a concession contract as such in 1998, the prevailing

understanding was that concession contracts were not procurement contracts. This understanding is evidenced in two significant ways. First, NPS regulations implementing the *1965 Act* expressly state that concession contracts "are not Federal procurement contracts or permits within the meaning of statutory or regulatory requirements applicable to Federal procurement actions." 36 C.F.R. 51.1. Second, the Court of Federal Claims decided in 1993 that concession contracts "did not constitute a procurement," because the NPS is not paying funds, but "collecting fees in exchange for granting a permit to operate a concession business." *YRT Services Corporation v. United States*, 28 Fed. Cl. 366, 392 n. 23 (1993). Given that this was the prevailing understanding of concession contracts in 1998, it is presumed that Congress was aware of and therefore adopted this view by enacting the 1998 Act without changing it.[13] *See Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change …"); *see also Keene Corp. v. United States*, 508 U.S. 200, 212, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993).

In light of this understanding of the 1998 Act, the Court is confident that the NPS's classification of concession contracts is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 841, 104 S.Ct. 2778. In arguing to the contrary, the plaintiffs cite certain cases where various non-Article III tribunals

---

**13.** It is worth noting that, while legislative history is far from a definitive indicator, a Senate report on the 1998 Act does speak to this issue. According to the report, "the policies and procedures of this title as implemented by the Secretary's regulations are govern-

ing requirements for concession contracts and that such contracts do not constitute contracts for the procurement of goods and services for the benefit of the Government or otherwise." S. Rep. 105–202, 105th Cong., 2d Sess. at 39 (June 5, 1998).

have found to the contrary. *See* Brief for Plaintiffs, Feb. 28, 2001, at 30–34 (citing, e.g., *In re R & R Enters.*, IBCA No. 2417, 1989 WL 27790, at \*58 (1989)). For the most part, these cases all pre-date the passage of the 1998 Act. And since the 1998 affirmed the "authorization" model of concession contracts, these cases can be considered rejected by the 1998 Act. Although one case, *Appeal of Watch Hill Concessions, Inc.*, IBCA 4284/2000, was decided after 1998, the Court is not bound in any way by that tribunal's decision. Moreover, the mere fact that another interpretation exists does not render the NPS's interpretation incorrect, because the NPS interpretation "need not be the only or most reasonable interpretation." *See Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. 2778, Rather, it need only be "rational and consistent with the statute," which the Court finds it to be. *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987).

## G. The Bid Evaluation Issue

 The plaintiffs argue that the NPS's method of selecting the winning bid for each concession contract impermissibly varies from the mandates of the 1998 Act. The Court disagrees.

The 1998 Act states the following with respect to bid selection:

(A) In selecting the best proposal, the Secretary shall consider the following principal factors:

(i) The responsiveness of the proposal to the objectives of protecting, conserving, and preserving resources of the unit of the National Park System and of providing necessary and appropriate facilities and services to the public at reasonable rates.

(ii) The experience and related background of the person, corporation, or entity submitting the proposal . . .

(iii) The financial capability of the person, corporation, or entity submitting the proposal.

(iv) The proposed franchise fee . . . .

16 U.S.C. § 5952. The 1998 Act also permits the Secretary to "consider such secondary factors as the Secretary deems appropriate ." 16 U.S.C. § 5952(5)(B). With regard to the weight accorded to each factor, the Act orders the NPS to weigh the proposed franchise fee less than the factors listed in (i). *See* § 5952(5)(A)(iv). Other than this, however, the 1998 Act does not specify how these factors shall be weighed.

In implementing this statute, the NPS promulgated the following regulation:

(a) The five principal selection factors are:

(1) The responsiveness of the proposal to the objectives, as described in the prospectus, of protecting, conserving, and preserving resources of the park area;

(2) The responsiveness of the proposal to the objectives, as described in the prospectus, of providing necessary and appropriate visitor services at reasonable rates;

(3) The experience and related background of the offeror, including the past performance and expertise of the offeror in providing the same or similar visitor services as those to be provided under the concession contract;

(4) The financial capability of the offeror to carry out its proposal; and

(5) The amount of the proposed minimum franchise fee, if any, and/or other forms of financial consideration to the Director. However, consideration of revenue to the

United States will be subordinate to the objectives of protecting, conserving, and preserving resources of the park area and of providing necessary and appropriate visitor services to the public at reasonable rates.

16 C.F.R. § 51.17. In accounting for each of these factors, the NPS utilizes a point system: an applicant can earn from 0 to 5 points for each of the first four factors, and can earn from 0 to 4 points on the franchise fee factor. For certain types of contracts, the NPS considers two additional, or "secondary", selection factors and awards them between 0 and 3 points:

> (b) The secondary selection factors are:
>
> > (1) The quality of the offeror's proposal to conduct its operations in a manner that furthers the protection, conservation and preservation of park area and other resources through environmental management programs and activities, including, without limitation, energy conservation, waste reduction, and recycling . . .; and
> >
> > (2) Any other selection factors the Director may adopt in furtherance of the purposes of this part, including where appropriate and otherwise permitted by law, the extent to which a proposal calls for the employment of Indians (including Native Alaskans) and/or involvement of businesses owned by Indians, Indian tribes, Native Alaskans, or minority or women-owned businesses in operations under the proposed concession contract.

36 C.F.R. § 51.17(b).

The plaintiffs argue that the NPS's regulations are arbitrary and capricious because they "dramatically alter the weights of the selection criteria from those that Congress saw fit to assign." Brief for Plaintiffs, Feb. 28, 2001, at 36. According to the plaintiffs' reading of the 1998 Act, Congress intended to "establish three coequal factors . . . as well as a fourth subordinate factor." *Id.*

The Court finds that, with regard to the total number of factors to be considered, and the weight to be attributed to each one, Congress has not "directly spoken to the issue." *Chevron*, 467 U.S. at 841, 104 S.Ct. 2778. The Court further finds that the disputed provisions are "based on a permissible construction of the statute." *Id.* With regard to the total number of factors considered, there is little argument that Congress meant to narrow the selection process to *only* the four enumerated factors. First and most obviously, the statute fails to use the word "only," which would be the most expedient and direct way to limit the evaluation criteria. Second, the statute explicitly contemplates the consideration of supplemental factors which the "Secretary deems appropriate." 16 U.S.C. § 5952(5)(B). Thus, there is very little reason to think that Congress' four-factor list is meant to be wholly exhaustive.

With regard to the weight to be applied to the various factors, the 1998 Act only addresses the weighing of one factor: the franchise fee is to be weighed less than the first statutory factor. The Act is conspicuously silent on all other weighing issues, and this silence must be interpreted to permit the NPS to weigh the remaining factors as it sees fit. *See National Rifle Ass'n*, 216 F.3d at 130–31 (where Congress includes particular language in one section of a statute, but omits it in another, the omission is presumed to be intentional). Of course, the NPS could weigh some factors so heavily, and others so lightly, that the weighing system effectively eliminates one factor from consideration. If this were the case, it would be a violation of the

NPS's duty to weigh all the factors. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Texas Oil & Gas Ass'n v. U.S. EPA,* 161 F.3d 923, 934 (5th Cir.1998) ("Although the EPA has significant discretion in deciding how much weight to accord each statutory factor under the [Clean Water Act], it is not free to ignore any individual factor entirely." (citations omitted)). But the current point system does no such thing; the franchise fee is still being weighed and is not being minimized to the extent of de facto exclusion.

Thus, the Court concludes that the NPS's system of selecting the winning bid for concession contracts is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); *see also General Elec. Co. v. United States Envtl. Protection Agency,* 53 F.3d 1324, 1327 (D.C.Cir.1995).

## H. Leasehold Surrender Interests

 The plaintiffs claim that the defendants' regulations deprive them of leasehold surrender interests granted to them by the 1998 Act. Generally speaking, a leasehold surrender interest is a leasee's monetary interest in the improvements he makes to property during his lease. When the lease is terminated, the leasee may then recoup the approximate value of his improvement. In 1998, Congress decided that concessioners, who often build extensive facilities on national park grounds, should be entitled to the value of certain improvements made on park property. Congress therefore granted each concessioner a "leasehold surrender interest in each capital improvement constructed by [the] concessioner." 16 U.S.C. § 5954(a)(1). "Capital improvement" is defined by the 1998 Act as "a structure,

fixture, or nonremoveable equipment provided by a concessioner pursuant to the terms of a concession contract." 16 U.S.C. § 5954(e)(2).

The plaintiffs take issue with 36 C.F.R. § 51.67, which states:

A concessioner will not obtain initial or increased leasehold surrender interest as a result of repair and maintenance of real property improvements unless a repair and maintenance project is a major rehabilitation.

36 C.F.R. § 51.67. A "major rehabilitation" is in turn defined as a "planned comprehensive rehabilitation of an existing structure, . . . [t]he construction cost of which exceeds fifty percent of the pre-rehabilitation value of the structure." 36 C.F.R. § 51.51. Finally, "pre-rehabilitation value" is defined as "the replacement cost of the structure less depreciation." *Id.* The plaintiffs argue that this regulation is contrary to the 1998 Act because the 1998 Act grants a leasehold surrender interest in "each capital improvement," not just the ones costing more than half a facility's existing value. For example, the plaintiffs argue that replacing a brick fireplace in the historic El Tovar Hotel at the Grand Canyon is clearly a capital improvement, and should give rise to a leasehold interest, even though the project's cost is nowhere near half the value of the hotel. Without expressing any opinion on the plaintiffs' example, the Court disagrees with the plaintiffs' reasoning.

Paramount to the plaintiffs' argument is their understanding of a capital improvement. They argue that the "plain meaning" of statutory language should control, and that the plain meaning of "capital improvement" is an "expenditure[ ] that add[s] to the value of an asset or materially prolongs its economic life." *See* Brief for Plaintiffs, Feb. 28, 2001, at 5. The plaintiffs falter, however, in that the 1998

Act explicitly defines capital improvement, thus rendering any colloquial definition irrelevant. "Capital improvement" is explicitly defined as "a structure, fixture, or nonremoveable equipment provided by a concessioner pursuant to the terms of a concession contract." 16 U.S.C. § 5954(e)(2). Nothing in the disputed regulation withholds a leasehold surrender interest from a concessioner who makes a capital improvement.[14] Rather, the regulation only addresses the "repair and maintenance" of concession facilities. Moreover, because there is nothing in the 1998 Act that gives rise to a leasehold surrender interest for repair and maintenance, the plaintiffs are actually better off with the regulation in place. Under the current regulations, the plaintiffs will be able to obtain a leasehold surrender interest for major rehabilitations that are not otherwise classified as capital improvements.

The Court therefore finds that the defendants' regulation concerning leasehold surrender interests for the repair and maintenance of concession facilities, 36 C.F.R. § 51.67, is permissible.

## I. The Repair and Maintenance Reserve

■■■■ The plaintiffs argue that the defendants' regulation requiring concessioners to contribute funds into a repair and maintenance fund violates the 1998 Act. Specifically, the plaintiffs claim that, since the fund proceeds are used for capital improvements, concessioners should have a leasehold surrender interest for the amount of money contributed to the fund.

In order to obtain a concession contract, concessioners must agree to "establish and manage a Repair and Maintenance Reserve, [the funds of which] shall be used to carry out ... [nonroutine] repair and maintenance of Concession Facilities." Standard Concession Contract, § 10(c); 65 Fed.Reg. 26069. According to the standard contract, the fund is designated for projects that are "non-recurring within a seven-year time frame," such as:

> repair or replacement of foundations, building frames, window frames, sheathing, subfloors, drainage, rehabilitation of building systems such as electrical, plumbing, built-in heating and air conditioning, roof replacement and similar projects.

*Id.* The contract further states that monies from this fund "shall not be used for a major rehabilitation" and that the concessioner shall "obtain no ... Leasehold Surrender Interest ... as a consequence of the expenditure of Repair and Maintenance Reserve Funds." *Id.*

In light of these regulatory provisions, as well as the provisions of the 1998 Act

**14.** The Court does note that the defendants define the word "structure", "fixture", and "nonremoveable equipment" in the regulations. *See* 36 C.F.R. § 51.51. Thus, it might be argued that an especially narrow regulatory definition of "structure", for example, could preclude a concessioner from obtaining a leasehold interest. The plaintiffs address this issue for the first time in their reply brief, and make the argument that, according to Oxford American Dictionary, "structure" refers not only to "buildings" but also "parts of buildings." *See* Brief for Plaintiffs, April 30, 2001, at 9. If this is true, then the word structure, being susceptible to more than one definition, is ambiguous. *See Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys.*, 847 F.2d 890, (D.C.Cir.1988) (referring to a dictionary to determine whether a word is susceptible to more than one meaning, and therefore ambiguous). The ambiguity in turn requires this Court to defer to an agency's reasonable interpretation. In the case at hand, the agency's definition encapsulates a standard definition of structure and is therefore eminently reasonable. The defendants' definitions of fixture and nonremoveable equipment, which the plaintiffs do not challenge, likewise raise no concerns of unreasonableness.

which guarantee concessioners a leasehold surrender interest for "capital improvements," the Court must determine whether the uses of the Repair and Maintenance Reserve are capital improvements. If they are, then the plaintiffs are due a leasehold surrender interest and the defendants' standard contract and regulations are unlawful. If the Reserve funds are not used for capital improvements within the meaning of the 1998 Act, then the disputed regulations are clearly acceptable.

█ To a large extent, the Court can only partially answer this question. This is because the list of enumerated uses for the Reserve funds is clearly not exhaustive, and even if it were, the uses are described so generally that it is impossible to categorize a use into a single category. For instance, the "rehabilitation" of a heating system may include the installation of a furnace, which likely is a capital improvement. On the other hand, a "rehabilitation" might only involve a draining of a building's radiators, which is not likely a capital improvement. Thus, although the denial of a leasehold surrender interest may be unlawful in some circumstances (i.e. in cases where the maintenance amounts to a capital improvement), the Court cannot say that the regulation, on its face, will be unlawful in its every application. Thus, this challenge to the regulation must fail. However, if in the future the plaintiffs can show that they were forced to expend Reserve funds on a project amounting to a capital improvement, they might have a viable claim that the Secretary acted arbitrarily and capriciously in disbursing Reserve funds. Until then, however, the regulation stands unaltered.[15]

## J. The Definition of Construction Costs

█ The plaintiffs argue that the defendants' regulatory definition of the statutory term "construction costs" is unreasonable.

In defining the scope of concessioners' leasehold surrender interests, the 1998 Act provides that "[t]he value of a leasehold surrender interest in a capital improvement shall be an amount [derived from the] construction cost of the capital improvement." 16 U.S.C. § 5954(a)(3). Under the formula provided in the Act, the greater the construction costs, the great a concessioner's leasehold surrender interest. Id. The defendants define "construction costs" as "the total of the incurred eligible direct and indirect costs necessary for constructing or installing the capital improvement." 36 C.F.R. § 51.51 "Eligible direct costs" are in turn defined as costs that are "necessary both for the construction of a capital improvement and are typically elements of a construction contract." Id. Finally, "eligible indirect costs" are "all other incurred capitalized costs . . . necessary for the construction of a capital improvement." Id. Likely examples of eligible indirect costs are "architectural and engineering fees for plans", "en-

---

15. The Court also rejects the plaintiffs' argument that the Repair and Maintenance Reserve violates section 407 of the 1998 Act, 16 U.S.C. § 5952, by "divert[ing] concessioner revenues away from the purposes specified by [the 1998 Act]." Brief for Plaintiffs, Feb. 28, 2001, at 9. Section 407 of the 1998 Act deals with the accounting and expenditure of franchise fees paid by concessioners. These fees are computed "based upon a [concessioner's] reasonable opportunity for net profit in relation to the capital invested and the obligations of the contract." 16 U.S.C. § 5956(a). Thus, because the Repair and Maintenance Reserve is an "obligation[ ] of the contract," franchise fees are not "diverte.." from the purposes specified in section 407. If they were, then every obligation in the contract which differed from the purposes of section 407 would be an improper "diverting" of funds.

vironmental studies", "risk insurance", and "fees or service charges and interest on construction loans." *Id.*

The plaintiffs argue that the defendants' definition of "construction costs" is unreasonable because it fails to "encompass[ ] administrative expenses, such as legal fees related to capital improvements." Brief for Plaintiffs, Feb. 28, 2001, at 13. The Court squarely disagrees. First, the Court finds that the term "construction cost" is not self-defining; i.e., it is "silent or ambiguous" with respect to the myriad of separate costs, such as legal fees, that emanate from a major construction project. *Chevron,* 467 U.S. at 841, 104 S.Ct. 2778. Given this ambiguity, the Court next finds that the defendants' definition of the term is reasonable. The definition encompasses a broad variety of expenses involved in construction, and explicitly relies on professional resources such as the "Dictionary of Architecture and Construction." *See* 65 Fed.Reg. 20650. Of course, some expenses that relate to construction are excluded, but some lines must be drawn. Otherwise, "construction costs" will end up including expenses far flung from the construction of the building, such as sales and marketing costs. *See* Fed.Reg. 20650. But the Court need not find that such costs should not be included; indeed, it is beyond this Court's judicial role to make such a determination. Rather, the Court need only measure whether the defendants' interpretation is reasonable, which the Court finds it to be.

Also on the subject of construction costs, the plaintiffs object to the defendants' condition that individual construction costs "be no higher that those prevailing in the locality of the project." 36 C.F.R. § 51.51. The plaintiffs argue that this "prevailing rate" standard fails to account for concessioners' added costs of "regulatory compliance." *See* Brief for Plaintiffs, Feb. 28, 2001, at 13. This point, even if true, is of no consequence to this tribunal *unless* it renders the prevailing rate standard unreasonable. But it does not; the prevailing rate standard is an eminently reasonable interpretation of the ambiguous statutory term "construction costs."

## K. The Leasehold Surrender Interest in Replaced Fixtures

 The plaintiffs argue that the defendants' regulation dealing with a concessioner's leasehold surrender interest in replaced fixtures, 36 C.F.R. § 51.65, violates the 1998 Act.

The relevant regulation states:

A concessioner that replaces an existing fixture in which the concessioner has a leasehold surrender interest with a new fixture will increase its leasehold surrender interest by the amount of the construction cost of the replacement fixture less the construction cost of the replaced fixture.

36 C.F.R. § 51.65. The plaintiffs argue that this regulation is contrary to 16 U.S.C. § 5954(a)(5), which states:

Where a concessioner ... makes a capital improvement to an existing capital improvement in which the concessioner has a leasehold surrender interest, the cost of such additional capital improvement shall be added to the then current value of the concessioner's leasehold surrender interest.

16 U.S.C. § 5954(a)(5). Elsewhere in the 1998 Act, Congress defines a "capital improvement" as a "structure, fixture, or nonremoveable equipment." 16 U.S.C. § 5954(e)(2).

The decision on this issue hinges on whether Congress "directly spoke[ ] to the issue" of leasehold surrender interests when fixtures are replaced. *Chevron,* 467

U.S. at 841, 104 S.Ct. 2778. For, if the Act is ambiguous in this regard, the regulation will stand as it is a reasonable way to account for leasehold surrender interests in the fixture-replacement context.[16] If the Act is not ambiguous, however, the disputed regulation must fall, as it conflicts with the "unambiguously expressed intent of Congress." *Id.* at 841, 104 S.Ct. 2778.

The Court finds that the 1998 Act is ambiguous with regard to the calculation of leasehold surrender interests for re-placed fixtures. Section 5954(a)(5), the only section of the Act which *might* ad-dress fixture replacement, does not ad-dress the replacement of a fixture; it clearly addresses the *addition* of a fixture (or capital improvement) to an existing fixture (or capital improvement). For ex-ample, when a concessioner adds a new wing to part of a guest lodge, section 5954(a)(5) entitles him to increase his leasehold surrender interest by the cost of this addition. Likewise, if the concession-er were to, years later, add an air condi-tioning system to this addition, section 5954(a)(5) permits him to increase his leasehold surrender interest by the cost of the air conditioning system as well. Sec-tion 5954(a)(5)'s focus on *adding* capital improvements, as opposed to *replacing* capital improvements, is made clear by the text of the statute. First, the section lim-its its application to circumstances where concessioners "make[ ] a capital improve-ment to an existing capital improvement."

This language is clearly language of addi-tion, as it would be difficult make a capital improvement to something if that some-thing was removed from the picture. Sec-ond, the statute even uses the word "addi-tion", as it provides that the cost of the "additional capital improvement shall be added to" the concessioner's leasehold sur-render interest.

Despite this reading of the statute, it might still be argued (in a particularly tortuous way) that certain replacement fix-tures *are* covered by the language of sec-tion 5954(a)(5). Using the example above, one could argue that, since the lodge's new wing is a "capital improvement" and the air conditioning system added to that wing is a "capital improvement", then, if the air conditioning system was later replaced with a new system, it could be said that this new system was not a "replacement", but simply an "addition" of a capital im-provement (the air conditioning system) to an already-existing capital improvement (the new wing). This interpretation strains the statute to the point of breaking. It is wholly illogical to think that Congress sought to provide leasehold surrender in-terests for replacement fixtures in a new wing, but not in the original lodge.

Thus, because no provision of the 1998 Act speaks directly to the issue of lease-hold surrender interests in replacement fixtures, and the defendants' regulation dealing with the issue is reasonable, the

---

**16.** The reasonableness of regulation is demon-strated by considering the competing alterna-tives in the context of a simple example. If a hotel owner with a leasehold surrender inter-est in the hotel were to replace the hotel furnace once every five years for 15 years, the plaintiffs' proposed accounting would be to increase the leasehold surrender interest three separate times by the cost of the fur-nace. Under this approach, the hotel owner would hold a leasehold surrender interest equal to four furnaces, even though the hotel would only contain one. The defendants' ap-proach would be to increase the leasehold surrender interest by the cost of the new furnace, but also to decrease it by the cost of the replaced furnace. Under this approach, the hotel owner's leasehold surrender interest would reflect a single furnace at the price level of the final purchase. This latter ap-proach is a logical and reasonable way of accounting for a concessioner's leasehold sur-render interest when fixtures are replaced.

Court finds that the regulation is permissible.

## L. Depreciation for Functional Obsolescence

██ The plaintiffs argue that the defendants' regulation on depreciation violates the clear language of 16 U.S.C. § 5954(a)(3). Specifically, the plaintiffs claim that section 5954(a)(3) orders assets to be depreciated *only* for "wear and tear", and not for "functional obsolescence" as well. *See* Brief for Plaintiffs, Feb. 28, 2001, at 19. Although the defendants' regulation mirrors section 5954(a)(3), *see* 36 C.F.R. § 51.51, the plaintiffs claim that the defendants intend to include functional obsolescence in its regulation as a matter of practice. In their brief, the defendants respond by assuring the plaintiffs that "functional obsolescence is not a consideration in the determination of depreciation under the new concession regulations." Brief for Defendants, Apr. 9, 2001, at 27. Therefore, because a dispute on this issue no longer remains, the Court will not opine on the matter except to note that the defendants' position is "nothing less than an official interpretation of the [1998 Act] which the agency may not change unless it provides a reasoned explanation for doing so." *Washington Legal Foundation,* 202 F.3d at 336.

## M. The Use of Leasehold Surrender Interests in Financing

██ The plaintiffs argue that the defendants' regulation improperly prevents them from pledging their leasehold surrender interests as collateral for financing. Specifically, the plaintiffs claim that they are improperly prohibited from pledging their leasehold surrender interest in one national park for a loan needed to make an improvement in another national park.[17]

Section 5954(a)(2)(A) of the 1998 Act states that a leasehold surrender interest

· may be pledged as security for financing of a capital improvement or the acquisition of a concessioner's contract when approved by the Secretary pursuant to this subchapter.

16 U.S.C. § 5954(a)(2)(A). The defendants' regulation, codified at 36 C.F.R. § 51.87, states that a leasehold surrender interest may be encumbered

either to finance the construction of capital improvements under the applicable concession contract in the applicable park area or to finance the purchase of the applicable concession contract.

36 C.F.R. § 51.87.

To begin with, the 1998 Act explicitly makes the securitization of every loan subject to the "approv[al] of the Secretary." Thus, Congress specifically gave the NPS a significant role in deciding when leasehold surrender interests may be pledged as security. Second, the Court sees no provision of the 1998 Act which "sp[eaks] directly to the issue" of whether a concessioner may pledge his leasehold surrender interest in one park for a loan in another park. *Chevron,* 467 U.S. at 841, 104 S.Ct.

---

**17.** The Court also notes that part of the plaintiffs' argument on this matter has been rendered moot. In their complaint and summary judgment motion, the plaintiffs argued that the defendants' regulations prevented them from using leasehold surrender interests as collateral in *re* financing. In their opposition, the defendants explained that the "general types of refinancing suggested by the plaintiffs are appropriate [under 36 C.F.R. § 51.87]." *See* Brief for Defendants, Apr. 9, 2001, at 28. Although the Court need not now consider this issue, the Court does note that the defendants' statement, inasmuch as it addresses the specific issue, is tantamount to an official enunciation of their policy on this issue. *See Washington Legal Foundation,* 202 F.3d at 336.

2778. The plaintiffs argue to the contrary, citing the definition of "capital improvement." *See* Brief for Plaintiffs, Feb. 28, 2001, at 25. The 1998 Act defines a capital improvement as a

> structure, fixture, or nonremoveable equipment provided by a concessioner pursuant to the terms of a concessions contract and located on the lands of the United States within a unit of the National Park System.

16 U.S.C. § 5954(e)(2). The plaintiffs assert that, because the 1998 Act permits the securitization of leasehold surrender interests to finance a "capital improvement," and the statutory definition of "capital improvement" refers to "a concessions contract ... within a unit of the National Park System," Congress has "directly spoken to the issue" of whether an interest in one park may be used to secure a loan for a project in a separate park. *Chevron,* 467 U.S. at 841, 104 S.Ct. 2778; *see also* Brief for Plaintiffs, Feb. 28, 2001, at 25.

This argument is preposterous. It strains even the most active imagination to think that Congress addressed the cross-park collateralization of concession loans in such a labyrinthian way. Finding that the 1998 Act is "silent or ambiguous with respect to [this] issue," the Court next finds the disputed regulation to be a reasonable interpretation of the Act. The regulation is grounded in the rational belief that cross-park collateralization expands the deleterious effects of loan defaults. A default on a cross-collateralized loan would put several facilities in several parks at risk. Moreover, when a bank forecloses on a loan, the bank will install its own replacement concessioner resulting in doubtless transitional inconveniences and miscues. *See* Brief for Defendants, Apr. 9, 2001, at 30. With this understanding, the Court has little hesitation in finding the disputed regulation to be reasonable.

## N. The Timing of Compensation for a Concessioner's Leasehold Surrender Interest

■ The plaintiffs argue that the defendants' regulation addressing the payment of former concessioners' leasehold surrender interests is contrary to law. The Court finds that the plaintiffs have no standing to make this claim.

The disputed regulation, 36 C.F.R. § 51.61(a), states the following:

> The date for payment of the leasehold surrender interest value, except in special circumstances beyond the [NPS's] control, will be the date of expiration or termination of the surrender interest contract, or the date the concessioner ceases to utilize related capital improvements under the terms of the concession contract.

The plaintiffs argue that this regulation is contrary to 16 U.S.C. § 5954(c), which reads in part:

> Upon expiration or termination of a concessions contract entered into after the effective date of this subchapter, a concessioner shall be entitled under the terms of the concessions contract to receive from the United States or successor concessioner the value of any leasehold surrender interest in a capital improvement as of the date of such expiration or termination.

Viewing the defendants' regulation and the 1998 Act together, the Court first observes that section 5954(c) only applies to concession contracts entered into *after* the effective date of the 1998 Act, which is November 13, 1998. Three of the four plaintiffs now in front of the Court (Amfac, Aramark, and Hamilton Stores) entered into their contracts before this date. Thus, their contracts are not controlled by the terms of section 5954(c), and they have

cited no other statutory provision which the defendants' regulation allegedly violates. Their motions on this issue are thus denied.[18]

■ The fourth plaintiff, the National Park Hospitality Association ("NPHA"), undoubtedly has members with concession contracts entered into after November 13, 1998. However, there is no way to determine whether an injury is actual or imminent unless the Court focuses on the expiration dates of specific contracts of NPHA members. As such, the resolution of this issue would require the "individual participation" of NPHA members, a factor that has long stood in the way of associational standing. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Harris v. McRae*, 448 U.S. 297, 320–21, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (finding an association to lack standing because the cause of action required the court to assess the motivations of specific association members); *Parks v. United States Internal Revenue Serv.*, 618 F.2d 677, 684–85 (10th Cir.1980) (denying a union standing because the alleged damages were "individual ....[and] not common to nor shared by all of the union members."). The Court therefore dismisses this claim from each of the plaintiffs' complaints pursuant to Federal Rule of Civil Procedure 12(b)(1).

### O. The Defendants' Restrictions on Concessioners' Corporation Control Transfers

■ The plaintiffs claim that the defendants' regulation permitting NPS review of corporate control transfers is contrary to the 1998 Act. The Court disagrees.

The relevant provision of the 1998 Act states:

> No concessions contract or leasehold surrender interest may be transferred, assigned, sold, or otherwise conveyed or pledged by a concessioner without prior written notification to, and approval by, the Secretary.

16 U.S.C. § 5957. The defendants' regulation implementing this provision states:

> The concessioner may not assign, sell, convey, grant, contract for, or otherwise transfer (such transactions collectively referred to as "assignments" for purposes of this part), without the prior written approval of the Director, any of the following:
>
> (a) Any concession contract;
> (b) Any rights to operate under or manage the performance of a concession contract as a subconcessioner or otherwise;
> (c) Any controlling interest in a concessioner or concession contract; or
> (d) Any leasehold surrender interest or possessory interest obtained under a concession contract.

36 C.F.R. § 51.85. The plaintiffs specifically argue that the 1998 Act gives the defendants no permission to approve or disapprove of any transfer of a controlling interest of a concessioner. *See* 36 C.F.R. § 51.85(c).

The Court first finds that the statutory language "or otherwise conveyed or pledged" is wholly silent with respect to the instant issue. That is, the terms "con-

---

18. To clarify the Court's holding, the Court does not find that these plaintiffs have no standing. As long as they have valid concession contracts, and the disputed regulation still applies to them, they have standing to challenge the regulation. However, their claims fail on the merits because, without the applicability of section 5954(c), they have no statutory provision which even remotely grants them a right on which the defendants' regulation infringes.

veyed" and "pledged" have a multitude of meanings, no particular one of which is made clear in the statute. Thus, finding the terms to be ambiguous on this issue, the Court considers the reasonableness of the defendants' regulation.

■ The Court has little hesitation in declaring the reasonableness of 36 C.F.R. § 51.85. Elsewhere in the 1998 Act, Congress instructs the Secretary to disapprove contract transfers if the acquiring party is not "qualified or able to satisfy the terms and conditions of the concession contract" or, if the transfer would not be "consistent with the objectives of protecting, conserving, and preserving the resources . . . of the National Park System." 16 U.S.C. § 5957(b). In light of these objectives, the defendants' regulation is a reasonable way to ensure that unqualified persons or entities do not put at risk any of our nation's natural treasures. If a company owning a concession contract were to be sold to another company, that new company (which might even be foreign to the United States) might have a wholly different policy or attitude with respect to its role as a concessioner. Moreover, even though this regulation remains in place, concessioners denied the right to transfer business interests can always bring an arbitrary and capricious claim, alleging that the NPS is misapplying section 5957(b). On its face, however, the regulation must stand.

## P. Conclusion

In conclusion, after reviewing the cross motions for summary judgment and the applicable law, the Court finds that the disputed regulations are permissible in all respects except one: the defendants may not deprive a concessioner of a preferential right of renewal if the concessioner fails to bid on a prospectus.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES the plaintiffs' Rule 56(f) motion; GRANTS in part and DENIES in part the defendants' motion to dismiss; GRANTS in part and DENIES in part the plaintiffs' joint motion for summary judgment; and GRANTS in part and DENIES in part the defendants' motion for summary judgment. An order consistent with this Opinion shall issue separately this date.

## ORDER

Consistent with the Memorandum Opinion issued this date, it is hereby

ORDERED that the defendants' motion to dismiss [11–1, 8–1, 12–1, 6–1] is DENIED as to all claims, except with respect to the timing of compensation for a concessioner's leasehold surrender interest and Hamilton Stores' franchise fee claim, for which it is GRANTED. It is therefore ORDERED that the plaintiffs' claim with respect to the timing of compensation for a concessioner's leasehold surrender interest and the franchise fee claim of Hamilton Stores are DISMISSED WITH PREJUDICE. Further, it is

ORDERED that the defendants' motion for summary judgment [11–2, 8–2, 12–2, 6–2] is GRANTED as to all issues addressed therein, except with respect to the forfeiture of a concessioner's statutory right of preferential renewal under 36 C.F.R. § 51.35, for which it is DENIED. It is therefore ORDERED that all of the plaintiffs' claims addressed in the defendants' January 18, 2001 motion for summary judgment, except for the claim regarding the forfeiture of a concessioner's statutory right of preferential renewal under 36 C.F.R. § 51.35, are DISMISSED WITH PREJUDICE. Further, it is

ORDERED that the plaintiffs' joint motion for partial summary judgment on the regulations pertaining to the contractual

right of preference in renewal [35–1, 28–1, 39–1, 18–1] is DENIED with respect to all issues presented therein; further, it is

ORDERED that the plaintiffs' joint motion for summary judgment on the regulations pertaining to contract performance and concessioner choice issues [36–1, 29–1, 40–1, 19–1] is DENIED with respect to all issues presented therein, except for the forfeiture of a concessioner's statutory right of preferential renewal under 36 C.F.R. § 51.35, for which it is GRANTED. It is therefore DECLARED that 36 C.F.R. § 51.35 is contrary to law to the extent it deprives concessioners of a statutory right of preferential renewal for not bidding on a prospectus. Further, it is ORDERED that the defendants are enjoined from applying 36 C.F.R. § 51.35 to the extent that the application deprives concessioners of a statutory right of preferential renewal for not bidding on a prospectus. Further, it is

ORDERED that the plaintiffs' joint motion for summary judgment on the regulations pertaining to concessioner investment and corporate control issues [37–1, 30–1, 41–1, 20–1] is DENIED with respect to all issues presented therein; further, it is

ORDERED that Hamilton Stores' motion for summary judgment of the franchise fee issue [64–1] is DENIED; further, it is

ORDERED that plaintiff Aramark's motion to extend time filed on January 19, 2001 [Civ. A. No. 00–3085, 10–1] is GRANTED; further, it is

ORDERED that plaintiff Hamilton Stores' motion to extend time filed on April 30, 2001 [Civ. A. No. 00–2937, 61–1] is GRANTED; further it is

ORDERED that the plaintiffs and the defendants, within 10 days of this date, file with the Court a description of all alleged claims, that have not been ruled on by the Court. Each claim shall contain a citation to the portion of the complaint lodging that claim. A proposed order setting a schedule for the resolution of any remaining claims shall also be attached.

Further, the Clerk of the Court is ORDERED to make the following corrections to the docket:

in Civil Action No. 00–2838: terminate motion [19–1], which was ruled on by Order of April 24, 2001[64]; transfer motion [56–1], which was not filed in this case, to Civil Action No. 00–2937, in which it was filed; terminate motion [72–1], which was not filed in this case; terminate motion [74–1], which was not filed in this case .

in Civil Action No. 00–2937: terminate motion [17–1], which was ruled on by Order of April 24, 2001[53]; terminate motion [37–1] which was withdrawn by pleading [62]; terminate motion [62–1], which was not actually a motion, but a notice of the withdrawal of a motion.

SO ORDERED.

